UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



| | |
|---|---|
| SAM COHEN, derivately<br>and on behalf of CITIGROUP, INC., | Civil Action No.<br>VERIFIED SHAREHOLDER'S<br>DERIVATIVE COMPLAINT |
| Plaintiff, | |
| vs. | |
| CITIGROUP, INC., CHARLES PRINCE,<br>ROBERT E. RUBIN, WINFRIED BISHCOFF,<br>ROBERT DRUSKIN, WILLIAM R. RHODES,<br>SALLIE L. KRAWCHECK, DAVID C.<br>BUSHNELL, STEVEN J. FREIDBERG, JOHN<br>C. GERSPACH, MICHAEL S. HELFER,<br>MICHAEL KLEIN, STEPHEN R. VOLK,<br>LEWIS B. KADEN, GARY CRITTENDEN,<br>RICHARD D. PARSONS, FRANKLIN A.<br>THOMAS, KENNETH T. DERR, C.<br>MICHAEL ARMSTRONG, JOHN M.<br>DEUTCH, ALAIN J.P. BELDA, ROBERTO<br>HERNANDEZ RAMIREZ, GEORGE DAVID,<br>ANNE M. MULCAHY, JUDITH RODIN,<br>ANDREW N. LIVERIS, ROBERT L. RYAN,<br>THOMAS G. MAHERAS, | DEMAND FOR JURY TRIAL |
| Defendants, | |
| – and – | |
| CITIGROUP, INC.<br>Defendant. | |

Plaintiff, Sam Cohen, upon his personal knowledge, as to the allegations pertaining to him, and belief as to all other allegations, based upon, amongst other things, the investigations made by his attorneys, submits this Verified Shareholder Derivative Complaint (the "Complaint") against the defendants named herein and alleges the following:

## INTRODUCTION

1.      This is a shareholder derivative action brought by a shareholder of Citigroup, Inc. ("Citigroup" or the "Company"), on behalf of the Company against certain of its officers and directors seeking to remedy defendants' violations of state and federal law that occurred between April 2006 and the present (the "Relevant Period") and that have caused substantial monetary losses to Citigroup and other damages, such as to its reputation and goodwill.

2.      Specifically, for the past several years, under the leadership of Citigroup's former chief executive, Charles Prince III was the lead underwriter of billions of dollars of Collateralized Debt Offerings ("CDOs") secured by risky, under-collateralized subprime mortgages.  As the subprime market began to collapse over the past several years, most investment banks reduced their exposure to CDOs.  But not Citigroup.  Prince caused Citigroup to charge forward and become the world's leading underwriter of these risky investments.

3.      On October 1, 2007, Citigroup was forced to announce a $1.4 billion write-down of its leveraged loan commitments.  Then on October 15, 2007, Citigroup announced third quarter earnings that were *60% lower* than the results of the Company just one year prior. However, this was not the end.

4.      The house of cards finally fell down on November 4, 2007 when Prince was forced to announce that Citigroup would write down more than $8 billion to $11 billion in the value of its CDOs and other investments and in the third quarter, has already suffered losses of $6.5 billion in asset markdowns and other credit-related losses and is expected to suffer as much as a $5 billion to $7 billion loss in the fourth quarter of fiscal year 2007 alone.

5.     How did Citigroup's board punish Prince for this staggering loss? They ignored unanimous demand from Wall Street and Citigroup's shareholders to fire Prince and instead allowed Prince to retire and to receive an exorbitant severance package in excess of $100 million.

6.     Prince did not act alone. Citigroup's officers and directors turned a blind eye to Prince's imprudent strategy and completely abdicated their role of ensuring that Citigroup had adequately managed its risk exposure. Even worse, some of the defendants named in this lawsuit intentionally caused Citigroup to issue financial statements that concealed the dangers Citigroup faced as a result of its huge exposure to CDOs.

7.     In addition, during the time when defendants were directing Citigroup to issue false and misleading statements concerning Citigroup's exposure to the subprime crisis, defendants were directing Citigroup to buyback over $663 million of its shares at artificially inflated prices. Moreover, certain defendants engaged in insider trading when they sold their holdings of the Company while in possession of material non-public information and reaped proceeds in excess of $40 million.

8.     During the Relevant Period, Citibank's value declined from $55 per share to less than $36 per share and the Company suffered an $83 billion market capitalization loss.

9.     As explained below, the defendants named in this lawsuit breached their fiduciary obligations to exercise a high degree of due care, loyalty and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. Because a majority of Citigroup's directors will not authorize a lawsuit against themselves, Plaintiff brings this action on behalf of Citigroup's to, among other things, recover the damages caused by the defendants' malfeasance.

## JURISDICTION AND VENUE

10.    This Court has jurisdiction over all claims asserted herein under 28 U.S.C. § 1332, as complete diversity exists between plaintiff and each defendant and the amount in controversy exceeds the jurisdictional minimum of this Court.

11.    Venue is proper in this Court because Citigroup has its principal place of business in this District; Plaintiff's claims arose in this District; and Citigroup has suffered and will continue to suffer harm in this District and is a citizen of New York.

## THE PARTIES

12.    Plaintiff Sam Cohen is, and was at the time of the transaction of which Plaintiff complains, an owner and holder of Citigroup common stock. Plaintiff, who is a citizen of Baltimore City, Maryland, currently owns 6,000 shares of Citigroup stock.

13.    Defendant Citigroup is a corporation organized and existing under the laws of the State of Delaware with its headquarters located at 399 Park Avenue, New York, NY 10043. Citigroup is a citizen of both New York and Delaware.

14.    Citigroup is a diversified global financial services holding company whose businesses provide a broad range of financial services to consumer and corporate customers. Citigroup has more than 200 million customer accounts and does business in more than 100 countries.

15.    Until his "retirement," Defendant Charles Prince III ("Prince") was at all times relevant hereto Chairman of the Board and Chief Executive Officer of Citigroup, until being forced to resign on November 2, 2007.

16.    Defendant Robert Druskin ("Druskin") is, and at all relevant times was, President and Chief Operating Officer ("COO") of Citigroup and Member of the Office of the Chairman of Citigroup.

17.    Defendant Gary Crittenden ("Crittenden") has served as Citigroup's Chief Financial Officer ("CFO") since February 2007.

18.    Defendant Robert E. Rubin ("Rubin") is a Director, Chairman of the Executive Committee and member of the Office of the Chairman of Citigroup.  As of November 2, 2007, upon the resignation of Prince, Rubin is the Chairman of Board of Directors of the Company.

19.    Defendant Sallie L. Krawcheck ("Krawcheck") was Chief Financial Officer ("CFO") of Citigroup from 2004-2007.  In March 2007, Krawcheck assumed the positions of Chairman and CEO of Citigroup's Global Wealth Management Division.

20.    Defendant Lewis B. Kaden ("Kaden") is Vice Chairman and Chief Administrative Officer at Citigroup.

21.    Defendant Sir Winfried Bishcoff ("Bishcoff") is the acting Chief Executive Officer of Citi, Chairman of Citi Europe, and a member of the Citi Business Heads, Management and Operating Committees.

22.    Defendant William R. Rhodes ("Rhodes") acts as the Senior International Officer for Citigroup.  Rhodes is also Citibank N.A.'s Chairman, President and CEO and Citicorp Holdings' President, CEO and Chairman.

23.    Defendant David C. Bushnell ("Bushnell") acts as the Chief Administrative Officer and Senior Risk Officer of Citigroup.

24.     Defendant Michael Klein ("Klein") is Chairman of Citigroup, Co-CEO of CitiMarkets & Banking, and is also Citigroup's Vice Chairman of Citibank International. From the period between January 2007 and March 2007, Klein served as Citigroup's Co-President, Corporate and Investment Banking.

25.     Defendant John C. Gerspach ("Gerspach") acts as the Controller and Chief Accounting Officer for Citigroup.

26.     Defendant Stephen J. Freidberg ("Freidberg") acts as Chairman and Chief Executive Office of the Global Consumer Group.

27.     Defendant John C. Gerspach ("Gerspach") acts as Controller and Chief Accounting Officer of Citi and is a member of the Citi Management Committee.

28.     Defendant Michael S. Helfer ("Helfer") is General Counsel and Corporate Secretary of Citigroup and a member of the Operating and Management Committees.

29.     Defendant Michael Klein ("Klein") Chairman and Co-Chief Executive Officer of Citi Markets & Banking.

30.     Defendant Richard D. Parsons ("Parsons") is a Citigroup director and is a member of Citigroup's Executive Committee.

31.     Defendant Stephen R. Volk ("Volk") acts as Vice chairman of the Board of Directors of Citigroup.

32.     Defendant Franklin A. Thomas ("Thomas") has served on Citigroup's Board of Directors since 1970.

33.     Defendant Kenneth T. Derr ("Derr") has served on Citigroup's Board of Directors since 1987.

34.    Defendant C. Michael Armstrong ("Armstrong") has served on Citigroup's Board of Directors since 1989, serves as Chairman of Citigroup's Audit and Risk Management Committee, and serves as a member of the Executive Committee since 2006.

35.    Defendant John M. Deutch ("Deutch") has served on Citigroup's Board of Directors since 1996 and is a member of Citigroup's Audit and Risk Management Committee since 1998.

36.    Defendant Alain J.P. Belda ("Belda") has served on Citigroup's Board of Directors since 1997 and is also a member of Citigroup's Executive Committee and a member of the Personnel and Compensation Committee.

37.    Defendant George David ("David") has served on Citigroup's Board of Directors since 2002 and is a member of Citigroup's Audit and Risk Management Committee

38.    Defendant Anne M. Mulcahy ("Mulcahy") has served on Citigroup's Board of Directors since 2004.

39.    Defendant Roberto Hernandez Ramirez ("Ramirez") has served on Citigroup's Board of Directors since 2001.

40.    Defendant Judith Rodin ("Rodin") has served on Citigroup's Board of Directors since 2004.

41.    Defendant Andres N. Liveris ("Liveris") has served on Citigroup's Board of Directors since 2005 and is a member of Citigroup's Audit and Risk Management Committee.

42.    Defendant Robert L. Ryan ("Ryan") has served on Citigroup's Board of Directors since July 2007 and is a member of Citigroup's Audit and Risk Management Committee.

43.    Defendant Thomas G. Maheras ("Maheras") was Citigroup's Chairman and Co-CEO of Citi Markets & Banking from May 2007- October 2007. Maheras also served as Citigroup's Co-President of Citi Markets and Banking in 2007 and CEO of Global Capital Markets from 2004-2007.

44.    Defendants Prince, Rubin, Bischoff, Druskin, Rhodes, Krawcheck, Bushnell, Freiberg, Gerspach, Helfer, Klein, Volk, Kaden, Crittenden, and Maheras are sometimes collectively referred to in this Complaint as the "Officer Defendants." Because of their positions with the Company, the Officer Defendants possessed the power and authority to control the contents of Citigroup's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Officer Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading. The Officer Defendants are liable for the false statements pleaded below.

45.    Defendants Parsons, Rubin, Derr, Thomas, Armstrong, Belda, Deutch, Ramirez, David, Mulcahy, Rodin, Ryan and Liveris are sometimes collectively referred to in

this Complaint as the "Director Defendants." By reason of their positions as directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Director Defendants owed the Company and its shareholders the fiduciary obligations to exercise a high degree of due care, loyalty and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The Director Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. As a result of these duties, the Director Defendants are obligated to use their best efforts to act in the interests of the Company and shareholders to ensure that no waste of corporate assets occurs. The Director Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

46.    Defendants Bischoff, Bushnell, Druskin, Freiberg, Gerspach, Helfer, Kaden, Klein, Krawcheck, Maheras, Prince, Rhodes, Rubin, and Volk are sometimes collectively referred to in this Complaint as "Insider Selling Defendants." Because of their positions with the Company, the Insider Selling Defendants possessed material non-public information at the time in which they executed the sales of their Citigroup common stock holdings.

## FACTUAL BACKGROUND

**Background of Citigroup**

47.    Citigroup is one of the world's leading wealth management, capital markets and advisory companies, with offices in 100 countries and total client assets of

approximately $2.2 trillion.   Citigroup offers a broad range of financial services to private clients, small businesses, and institutions and corporations.

48.     As the largest United States bank by assets, Citigroup is a leading global trader and underwriter of securities and derivatives across a broad range of asset classes and serves as a strategic advisor to corporations, governments, institutions and individuals worldwide.

**Prince Takes the Helm at Citigroup**

49.     In early 1996, Citigroup appointed Prince Executive Vice President and by early 2000, made him Chief Administrative Officer.  In early 2001, Prince was named Chief Operating Officer and by 2002 he rose through the ranks becoming Chairman and CEO of Markets & Banking.  In October 2003, Prince became CEO of Citigroup. By 2006, Prince was named Chairman of Citigroup's board of directors.

50.     Prince touted a business strategy that called for expansion overseas and internal growth.  According to one commentator, "Prince never had experience managing the banks operations before he was chosen for the top job. He lacked credibility with Wall Street. And when the company's results foundered, his austere, lawyerly manner, albeit leavened with a sharp sense of humor, did not go over well." Prince's strategy eventually caused Citigroup's expenses to outweigh revenues, botched its fixed income trading operations and caused its cash-to-debt ratio to dip extraordinarily low.  Throughout Prince's tenure, Citigroup's stock lagged its peers. By November 3, 2007 Citigroup's dropped to $37.73, about 20 percent below where they were when Prince became CEO.

51.     In order to undue the damage his cost-cutting had done to Citigroup's business, Prince caused Citigroup to ramp up its investments in CDOs.  Specifically, after a

loan is originated, it is often packaged up into an asset-backed security. These are then sliced into different tranches and sold to institutional investors such as hedge funds and insurers. CDOs became very popular among fixed-income investors looking for higher yields in a low-yield world. In 1995, there were hardly any. In 2006, CDOs worth more than $500 billion were issued.

52.     CDOs helped fuel the housing boom of the late 1990s and most of this decade. About 40% of CDO collateral is residential-mortgage-backed securities. Almost three quarters of that is secured by risky subprime and home-equity loans.

53.     When the housing bubble began to burst, rating agencies quickly began downgrading many CDOs. And while most brokerage firms began pulling back from the CDO market, Citigroup did not.

54.     Indeed, equity analysts warned companies with subprime exposure that lower earnings could be expected since demand for the debt could dissipate quickly as credit worsened. However, Prince forged on with his "strategy." According to one commentator, "the anger toward Prince was so intense that during a conference call in [October 2007], Deutsche Bank analyst Mike Mayo told Prince that investors wanted a significant change in management."

55.     The Individual Defendants, named herein, directed Citigroup to acquire a vast inventory of securities backed by mortgages made to subprime borrowers. Subprime borrowers have a high probability of default as a result of having low credit scores and higher debt-to-income ratios. Typically, subprime borrowers are able to stay current due to rising equity in their property, but when home prices decline, default rates increase, such was the trend that began in late 2006.

56.    By 2007, subprime lenders, including New Century Financial Corporation and Accredited Home Lenders Holding Company, could no longer stay afloat, the Individual Defendants recklessly directed Citigroup to purchase over 2.7 billion in subprime loans from Accredited at one of its "fire sales" it needed to conduct in order to avoid bankruptcy.

57.    In addition, most of Prince's compensation package is tied to his performance at the Company. For example, during the year ended December 31, 2006, Prince received a bonus of $13.2 million and stock awards amounting to $10.6 million, in addition to his base salary of $1 million. Defendants were motivated by Citigroup's compensation arrangement, which was determined by the reported financial performance of the Company.

**Financial Performance:**

- Organic revenue growth, in the mid-to-high single digit range for Citigroup. Organic Revenues grew 7% almost all of which was organic;

- Net income growth faster than revenue growth. Net income from continuing operations grew at about the same rate as total revenues (about 7% in each case);

- Return on equity in the 18-20% range for 2006 for Citigroup. The 2006 return on equity was 18.8%;

- Total return to stockholders compared to peer companies listed above. Total return to stockholders was 19.6% which was lower than many of the listed peer companies but comparable to large money center banks;

- For 2006, Defendants received the following compensation:

| Executive | Year | Salary | Bonus | Stock Awards | Stock Options | Other Compensation | Total ($) |
|-----------|------|--------|-------|--------------|---------------|--------------------|-----------|
| Prince | 2006 | $1,000,000 | $13,200,000 | $10,633,333 | $746,607 | $258,338 | $25,975,719 |
| Krawcheck | 2006 | $500,000 | $5,820,000 | $2,946,251 | $645,701 | - | $9,918,267 |
| Rubin | 2006 | $1,000,000 | $8,400,000 | $6,766,666 | $828,342 | $325,380 | $17,341,304 |
| Druskin | 2006 | $500,000 | $8,100,000 | $6,555,103 | $467,680 | $43,911 | $15,709,046 |
| Volk | 2006 | $200,000 | $5,670,000 | $3,915,520 | - | $29,488 | $9,825,936 |

### Defendants Cause Citigroup to Issue False-and-Misleading Financial Statements

58.     Between April 2006 and July 2007, the Individual Defendants caused Citigroup to issue at least three SEC filings painting a rosy picture of Citigroup's finances. Specifically:

59.     On April 17, 2006, Citigroup issued first quarter of 2006 financial results, in a press release which stated in part:

> Citigroup Inc., announced today reported net income for the first quarter of 2006 of $5.64 billion, or $1.12 per share.  Return on common equity was 20.3%.  Results include $846 million of compensation expense ($520 million after-tax) related to stock grants to retirement –eligible employees required under SFAS(R), and a $657 million tax benefit related to the resolution of a federal tax audit for the years 1999 through 2002.

> First Quarter Highlights

> - International earnings increased 47% driven by record international revenues, up 19%.
>   - Record corporate and investment banking revenues, up 34%, and net income, up 80%
>
>   - Record fixed income markets revenues of $3.15 billion, up 8%; record equity market revenues of $1.18 billion, up 67%; record investment banking revenue of $1.22 billion, up 34%
>
>   - #1 rank in global debt underwriting #1 in announced global M&A; #2 in global equity underwriting

  ○ Record transaction services revenues, up 22%, driven by double-digit growth in customer balances

- In International consumer, earnings were up 21% cards average loans grew 14% and consumer finance loans outside of Japan were up 8%. In retail banking, investment AUMs increased 20%.

- U.S. consumer average loans grew 10%, reflecting loan growth in consumer lending and retail distribution of 18% and 8% respectively, and commercial business core loans, up 23%. Card purchase sales increased 11%, while average managed receivables declined 2%.

- Record Smith Barney revenues, up 19%, with client assets under fee-based management up 33%.

- The decline in net interest margin moderated to 6 basis points versus the fourth quarter 2005, with mix-driven spread compression in U.S. consumer partially offset by international consumer spread expansion.

- The Credit environment remained favorable, including a significant decline in U.S. consumer bankruptcy filings.

- Operating expenses increased 17%, comprised of 7 percentage points from SFAS 123 (R) charges, 9% due to organic business growth and acquisitions, and 1% due to investment spending.

- 238 new branches were opened, including 36 in the U.S. and 202 internationally.

- Share repurchases totaled $2billion, or approximately 43 million shares.

Management Comment

"I am very pleased with out first quarter accomplishments, which included strong growth in client activity across many franchises. We are seeing the benefits from our investment spending, which helped generate record revenues in our international businesses and record revenues globally in our corporate and investment banking business. Strength in these franchises more than offset weaker results in our U.S. consumer business," said Charles Prince, Chief Executive Officer of Citigroup.

"We executed on our strategic initiatives, adding a record 238 new branches in 19 countries, as well as opening our first private bank office

in mainland China.   We also enhanced our ability to serve more customers through the launch of Citibank Direct, our full-service internet bank, and through a partnership with 7-Eleven convenience stores, we added over 5,500 ATMs to our U.S. distribution network.  We remain sharply focused on our strategic initiatives leveraging our unique strengths to achieve long-term growth and superior returns for our owners," said Prince.

60.     On May 5, 2006, Citigroup filed its Form 10-Q for the first quarter of 2006 ("10-Q 2006"), which included the same financial results previously reported.  The Form 10-Q 2006 also includes a certification by Prince.   Defendant Krawcheck also signed a certification that is included in the 10-Q 2006.  The certification by Prince is stated as follows:

I, Charles Prince, certify that:

1.   I have reviewed this Quarterly Report on Form 10-Q of Citigroup Inc.:

2.   Based on my knowledge, this report does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statement made, un light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included I this report, fairly presents in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f) for the registrant and have:

a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a.  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b.  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

61.    On July 17, 2006, Citigroup issued its results for the second quarter of 2006, in a press release which stated in part:

Citigroup Inc. today reported net income for the second quarter of 2006 of $5.27 billion, or $1.05 per share. Return on common equity was 18.6%.

Second Quarter Highlights

- International revenues increased 17% and international net income was up 11%.

- Corporate and investment banking revenues were the second highest ever, increasing 31%; income up 26%.

  o  International corporate and investment banking revenues up 23%, U.S. revenues up 44%.

  o  Fixed income and equity markets revenues up 51% and 30%, respectively, despite volatile emerging market conditions. Investment banking revenues were up 24%.

  o  YTD #1 rank in global debt underwriting; #2 in global announced M&A; #2 in global equity underwriting.

  o  Record transaction services revenues and net income, up 26% and 18% respectively, driven by double-digit growth in customer balances.

- International consumer revenues and net income grew 12% and 10%, respectively. Average loans were up 6% and deposits increased 9%. Retail banking investment sales grew 60%, and card purchase sales increased 15%.

- U.S. consumer revenues and net income increased 1% and 11%, respectively. Average loans were up 13% and deposits increased 8%. Retail banking investment product sales increased 37%, and card purchase sales grew 12%.

- Global wealth management revenues were up 19%, with client assets under fee-based management up 23%.

  - International revenues increased 38% and U.S. revenues grew 16%.

- Alternative investments revenues and net income declined, driven by lower private equity results.

- The net interest margin declined 14 basis points versus the first quarter 2006, with the increase in the sequential quarter decline driven by trading activities in capital markets and banking.

- The credit environment remained favorable, with significantly lower U.S. consumer bankruptcy filings.

- Operating expenses increased 16%, comprised of 12 percentage points due to organic business growth and acquisitions, 2% due to investment spending, and 2% due to SFAS 123(R) accruals.

- A record 270 new branches were opened, including 74 in the U.S. and 196 internationally. Year-to-date, 508 branches have been opened, of which 110 are in the U.S. and 398 international.

- Share repurchases totaled $2.0 billion, or approximately 41 million shares

**Management Comment**

"In the second quarter, we achieved our second highest income from continuing operations while making significant progress on our strategic initiatives. We added a record number of new consumer branches during the

quarter, bringing our total year-to-date new branch openings to 508. We also opened corporate and investment banking offices in Kuwait and Dubai. The results from our newly launched Citibank e-savings business have been exceptional, with $4.2 billion of deposits since its launch 3 months ago— approximately two-thirds representing new money to Citibank," said Charles Prince, Chairman and Chief Executive Officer of Citigroup.

"In international consumer, strong volume growth across our franchise drove a 12% increase in revenues. U.S. consumer also achieved strong volume growth and, despite headwinds from spread compression, showed improving momentum from the first quarter. And in corporate and investment banking, we achieved our second highest revenues, despite challenging conditions in the emerging markets," said Prince.

"We are very pleased with the momentum we are building as we execute on our strategic initiatives, strengthen our franchises, and position Citigroup for continued long-term earnings growth," said Prince.

62.      On August 4, 2006, Citigroup issued its financial results for the third quarter

of 2006, in a press release which stated in part:

> Citigroup Inc. reported net income for the third quarter of 2006 of $5.5 billion, or $1.10 per share return on common equity was 18.9%.

Third Quarter Summary

- Total revenues were approximately even with the third quarter 2005, as international revenue growth was offset by a decline in U.S. revenues, reflecting lower revenues in capital markets driven businesses.

    o International revenues increased 11%, with international consumer up 9%, international corporate and investment banking up 12%, and international wealth management up 33%.

- U.S. consumer revenues and net income increased 1% and 23%, respectively. Average managed loans were up 12% and deposits increased 11%. Retail banking investment product sales increased 16%, and card purchase sales grew 9%.

- International consumer revenues increased 9%, and net income was up 8%. Average loans grew 9%, and deposits increased 9%. Retail banking investment sales grew 18%, and card purchase sales increased 18%.

- Corporate and investment banking revenues and net income declined 6% and 4%, respectively.

  o Capital markets and banking revenues and net income declined 12% and 6%, respectively, driven by lower revenues in fixed income markets and equity underwriting, which was partially offset by growth in debt underwriting and advisory.

  o YTD #1 rank in global debt underwriting; #2 in global announced M&A; #2 in global equity underwriting.

- Transaction services revenues were a record, up 20%, and net income increased 18%, driven by double-digit growth in customer balances.

- Global wealth management revenues increased 14%, and net income was up 30%. Fee-based and net interest revenues increased 26%, and client assets under fee-based management grew 22%.

- Alternative investments revenues and net income declined significantly, driven by lower results from private equity portfolios and liquid investments.

- The net interest margin declined 11 basis points versus the second quarter 2006, primarily due to trading activities in capital markets and banking.

- The U.S. credit environment remained stable, with significantly lower consumer bankruptcy filings. The international consumer credit environment was generally stable, with the exception of higher credit costs recorded in certain countries, including Japan and Taiwan. In Japan, ongoing legislative and other actions impacting the consumer finance industry led to approximately $160 million in increased credit costs.

- Operating expenses increased 5%, comprised of 3 percentage points, or $320 million, due to increased investment spending, and 2 percentage points, or $195 million, due to SFAS 123(R) accruals. Excluding investment spending and SFAS 123(R) accruals, expenses were flat with the prior-year period.

- The effective tax rate for continuing operations was 27.4%, reflecting a $237 million tax benefit related to resolution of a tax audit. See schedule A for detail.

- A record 277 new branches were opened, including 101 in the U.S. and 176 internationally. Year-to-date, 785 branches have been opened, of which 211 are in the U.S. and 575 international.

- Share repurchases totaled $2 billion, or approximately 41 million shares. Over the last 12 months, share repurchases total $10.4 billion, or approximately 218 million shares.

**Management Comment**

"Our third quarter results were driven by strength in several businesses, including international revenues, up 11%. In our U.S. consumer franchise, we are pleased with the trends we are seeing, and throughout all our businesses, we had good expense discipline. That said, results from our capital markets related businesses fell short of my expectations, and I expect improved results from these businesses going forward," said Charles Prince, Chairman and Chief Executive Officer of Citigroup.

"During the quarter, we continued to execute on our strategic initiatives, investing approximately $320 million to reach and serve our customers in more places, and more effectively. At the same time, we remained highly disciplined on our non-investment expenses." We also repurchased $2 billion of our common shares during the quarter.

63.     On November 3, 2006, the Company filed its Form 10-Q for the third quarter of 2006, which included the same financial results as previously reported. The Form 10-Q also contained virtually identical certification by Prince and Krawcheck as contained in Citigroup's Form 10-Q for the first quarter of 2006, as cited above in ¶60.

64.     On January 19, 2007, the Individual Defendants caused or allowed Citigroup to issue a press release announcing its earning for fourth fiscal quarter 2006 ("4Q 2006"), which stated in part:

Citigroup Inc., today reported net income for the 2005 fourth quarter of 5.13 billion, or $1.03 per share. Results include previously disclosed charges of $415 million after-tax in Japan consumer finance to increase reserves and reposition the business. Return on common equity was 17.2%. For the full year 2006, net income was $21.54 billion, or $4.31 per share, and return on common equity was 18.8%. See Appendix A for full year business segment results.

**Management Comment.**

"Our results were highlighted by double-digit revenue growth in our corporate and investment banking, wealth management and alternative investment businesses. In U.S. consumer, we continued to see positive trends from our strategic actions. Performance in these businesses was partially offset by lower results in international consumer, which included significant charges in our Japan consumer finance business. Customer balances continued to grow strongly, partly driven by our investment in new distribution," said Charles Prince, Chairman and CEO of Citigroup.

"During the quarter, we continued to expand our business through a balance of organic investment and targeted acquisitions. We opened a record number of branches and continued to invest in our technology and our people. We led a consortium that acquired 85% of Guangong Development Bank in China. In Central America, we announced the acquisition of Grupo Financiero Uno, a consumer credit card franchise, and Grupo Cuscatlan, a corporate and consumer bank. We also announced the acquisition of Quilter, one of the United Kingdom's most respected wealth advisory firms, and the acquisition of 20% stake in Akbank, a leading Turkish bank," said Prince.

"Our 2007 priorities are clear: generating sustainable growth in U.S. consumer, growing international consumer, corporate and investment banking and wealth management businesses more quickly, focusing sharply on expense management, and remaining highly disciplined in credit management. We will continue to invest to integrate our businesses and expand our reach, while a the same time taking a thorough review of our entire expense base to ensure that we operate as efficiently and effectively as possible," said Prince.

**Fourth Quarter Summary:**

- Revenues were a record, up 15%, driven by 14% revenue growth in corporate and investment banking, 79% in alternative investments and 21% in global wealth management, Global consumer revenues increased 9%.

- International Revenues grew 11% with international corporate investment banking up 20% and international wealth management up 48%. International consumer revenues increased 2%, including the impact of charges in Japan consumer finance.

- Deposits and loans grew 20% and 16% respectively. In global consumer, investment AUM's increased 17%. Capital

markets and banking ranked #1 in global debt underwriting, #2 in announced M&A and #2 in global equity underwriting and global loan syndications for the full year 2006. In global wealth management, client assets under fee-based management grew 15%.

- Operating expenses increased 23%, including 4 percentage points due to increased investment spending, **3** percentage points due to acquisitions and foreign exchange, and 2 percentage points due to SFAS 123(R) accruals. The remaining expense growth was driven by higher business volumes, and the absence of a net release of legal reserves that lowered expenses in the prior-year period.

  o The company opened a record 380 new branches, including 288 internationally and 92 in the U.S. For the full year 2006, a record 1,165 branches have been opened, of which 862 are international and 303 are in the US. Credit costs increased lo%, as lower costs in U.S. consumer were more than offset by increased credit costs in international consumer and corporate and investment banking. U.S. consumer credit costs declined due to lower bankruptcy filings.

- In international consumer, credit costs primarily reflected portfolio growth, including a significant increase in Mexico due to target market expansion. The international and U.S. consumer credit environment was generally stable. The global corporate credit environment also remained stable. Excluding charges in Japan consumer finance, the net interest margin was even with the 2006 third quarter. Share repurchases totaled $1 billion, or approximately 19 million shares. For the full year 2006, share repurchases totaled $7 billion and dividends paid to common shareholders totaled $9.8 billion.

- **Capital Markets & Banking**. Fixed income markets revenues increased 32% to $2.75 billion, primarily driven by improved results in interest rate and credit products and foreign exchange.

65.     April 16,2007, the Individual Defendants caused or allowed Citigroup to issue

a press release announcing the Company's earnings for the first fiscal quarter 2007 ("1Q

2007"). The press release announced record revenues driven by 23% revenue growth in

Citigroup's Markets & Banking business segment. The press release stated in relevant part:

> Citigroup Inc. today reported net income for the 2007 first quarter of $5.01 billion, or $1 .O1 per share. Results include a previously disclosed charge of $1.38 billion, or $871 million after-tax, related to a structural expense review conducted during the quarter. Excluding the charge, net income was $5.88 billion, or $1.18 per share. Return on common equity was 17.1%.

> **Management Comment**

> "We generated strong momentum this quarter, with revenues increasing 15% to a record, driven by growing customer business volumes. Global consumer deposits were up 12% and global consumer loans grew 11%. In our international franchises, revenues grew 18%, led by international markets & banking revenue up 20%. Our revenue growth combined with improving expense management and, after adjusting for certain non-recurring items, we generated positive operating leverage. Offsetting our improved revenue and expense performance were higher credit costs and a lower level of tax benefits than last year," said Charles Prince, Chairman and Chief Executive Officer of Citi.

> "We continued to invest in expanding our distribution and enhancing our technology as we build a broad, strong foundation for future growth. We also announced the acquisition of Egg, Ltd. in the U.K., the world's largest internet bank, and we launched a tender offer to acquire 100% of Nikko Cordial in Japan, consistent with our effort to drive growth through a balance of organic investment and targeted acquisitions and expand internationally," said Prince.

> "We achieved these results while completing our structural expense review, which will help us become a leaner, more efficient organization and lower our rate of expense growth. As we look ahead, our priorities are clear: we will invest to grow and integrate our businesses, take actions to improve efficiency and lower costs, and continue to build momentum across our franchises," said Prince.

> **First Quarter Summary:**

> - Revenues were a record, up 15%, driven by **23%** revenue growth in markets & banking, including record revenues in fixed income and equity markets, investment banking and transaction services. International consumer revenues grew

- 24 -

14% and global wealth management revenues were on record, up 13%. U.S. consumer revenue growth continued to trend positively, up 6%.

- o Revenue growth reflected customer volume growth. Deposits and loans grew 18% and 15%, respectively. In global consumer, AUMs increased 12%. Securities and banking ranked #1 in global debt and equity underwriting and #2 in completed M&A for the first quarter. In global wealth management, client assets under fee-based management grew 13% and client capital in alternative investments grew 52%. Net interest revenues grew 8% as volume growth was partially offset by net interest margin compression. Excluding the impact of gray zone in Japan consumer finance, the net interest margin declined 14 basis points versus the fourth quarter 2006, with slightly less than half of the decline in trading portfolios.

- **Operating Expenses.** Operating expenses increased 17%, including a $1.38 billion charge related to a structural expense review completed in the quarter. Excluding the charge, compensation accruals related to the revenue impact of adopting SFAS 157, and $648 million pre-tax in SFAS 123(R) accruals recorded in the prior-year period, expenses grew 10 %, driven by increased business volumes and investment spending.

  - o The company opened 99 new branches during the quarter, including 48 internationally and 51 in the U.S. Credit costs increased $1.26 billion, primarily driven by an increase in net credit losses of $509 million and a net charge of $597 million to increase loan loss reserves. The $597 million net charge compares to a net reserve release of $1 54 million in the prior-year period.

- In U.S. consumer, higher credit costs reflected an increase in net credit losses of $164 million and a net charge of $182 million to increase loan loss reserves. The $1 82 million net charge compares to a net reserve release of $196 million in the prior-year period.

- Credit costs increased primarily in U.S. consumer lending and U.S. retail distribution, reflecting portfolio growth, an

increase in delinquencies in second mortgages, and a change in estimate of loan losses inherent in the portfolio.

- In international consumer, higher credit reflected an increase in net credit losses of $331 million and a net charge to increase loan loss reserves of $1 12 million. Higher credit costs primarily reflected portfolio growth, including target market expansion in Mexico cards and the integration of Credicard in Brazil, increased net credit losses in Japan consumer finance, and a change in estimate of loan losses inherent in the portfolio. The international consumer credit environment was generally stable.

- Markets and Banking credit costs increased primarily due to a net charge of $286 million to increase loan loss reserves due to portfolio growth, which includes higher commitments to leveraged transactions and an increase in average loan tenor. The $286 million net charge compares to a $33 million net charge to increase reserves in the prior-year period. The global corporate credit environment remained stable.

- The effective tax rate on continuing operations was 26.9% versus 21.5% in the prior year period. The current period tax rate includes the impact of a charge related to the structural expense review and certain APB 23 benefits described below.

- The 2006 first quarter tax rate included a $598 million tax benefit on continuing operations, or $657 million in total, due to resolution of a federal audit. Share repurchases totaled $645 million, or approximately 12.1 million shares.

**Markets and Banking:**

- Fixed income markets revenues increased 20% to a record $3.8 billion, driven by improved results across all products, including interest rates and currencies, and credit and securitized products.

66.     On July 20, 2007, the Individual Defendants caused or allowed Citigroup to issue a press release announcing the Company's earnings for the second quarter of 2007 ("2Q 2007"), in a release which stated in part:

Citigroup Inc. today reported net income for the 2007 second quarter of $6.23 billion, or $1.24 per share, both up 18%. International

revenues and net income were a record, up 34% and 35%, respectively. Return on equity was 20.1%.

**Management Comment.**

"We have very clear priorities to drive growth and we are executing on all of them. We generated *record revenues,* up 20%, and record earnings from continuing operations, up 18%, both driven by our record international results," said Charles Prince, Citi Chairman and Chief Executive Officer.

"We *continued to generate revenue and volume growth* in our U.S. consumer franchise, while making excellent progress in re-weighting Citi toward our other businesses, especially our international franchises, where revenues and net income increased over 30%. Our capital markets-driven businesses performed extremely well and international consumer revenues and volumes grew at a double- digit pace," said Prince.  "We also began to implement the structural expense initiatives announced in April, which are generating improved efficiencies. These initiatives, coupled with strong revenue growth, drove positive operating leverage this quarter and helped offset increased credit costs."

"We made excellent progress in expanding our business through targeted acquisitions, completing three international transactions, including an increase in our ownership of Nikko Cordial Corporation in Japan to *68%,"* said Prince.

**Second Quarter Summary:**

- Revenues were a record, up 20%, led by 34% growth in international revenues. International markets & banking revenues grew 50%, international consumer revenues increased 16%, and wealth management revenues more than doubled. Revenue growth reflected double-digit customer volume growth. Deposits and loans grew 20% and 17%, respectively. Securities and banking ranked #1 in global debt underwriting, #2 in announced **M&A,** #3 in global equity underwriting, and achieved record revenues in equity markets and transaction services.

- In Global Wealth Management, client assets under fee-based management grew 40%, and client capital in alternative investments increased 5.5 %. Strong volume growth drove a 16% increase in net interest revenues.  Excluding the impact of acquisitions, organic revenue growth was 16%.  The net

interest margin declined 6 basis points versus the first quarter 2007, as the benefit from lower cost of funds was offset by growth in lower yielding trading assets.

- Operating expenses increased 16%, driven by increased business volumes and acquisitions, which were partially offset by savings from structural expense initiatives announced in April 2007, and the release of $300 million of litigation reserves reflecting our continued progress in favorably resolving WorldCom Research matters.

  o The company opened or acquired 160 new retail bank or consumer finance branches during the quarter, including 136 internationally and 24 in the U.S. Over the last twelve months, 1,001 retail bank and consumer finance branches have been opened or acquired. Excluding the impact of acquisitions, organic expense growth was 12%.

- Credit costs increased $934 million, primarily driven by an increase in net credit losses of $259 million and a net charge of $465 million to increase loan loss reserves. The $465 million net charge compares to a net reserve release of $21 0 million in the prior-year period.

  o In U.S. consumer, higher credit costs reflected an increase in net credit losses of $183 million and a net charge of $245 million to increase loan loss reserves. The $245 million net charge compares to a net reserve release of $274 million in the prior-year period. The increase in net credit losses and loan loss reserves **primarily** reflected higher delinquencies in second mortgages in consumer lending, a change in estimate of loan losses inherent in the cards portfolio, and portfolio growth.

- In International Consumer higher credit costs reflected an increase in net credit losses of $155 million and a net charge to increase loan loss reserves of **$236** million. The **$236** million net charge compares to a net reserve release of $62 million in the prior-year period. The increase in net credit losses and loan loss reserves primarily reflected portfolio growth, an increase in past due accounts and portfolio seasoning in Mexico cards, higher net credit losses in Japan consumer finance, and the impact of recent acquisitions.

    o Markets & banking credit costs declined, reflecting a stable global credit environment and the absence of a $1 18 million net increase to loan loss reserves recorded in the prior-year period.

   • The effective tax rate on continuing operations was 29.9% versus 30.3% in the prior-year period. The current period tax rate includes the impact of certain APB 23 benefits of $96 million described below.

  Fixed income markets revenues increased 24% to $3.42 billion, driven by improved results across all products, including interest rates and currencies, credit and securitized products, and commodities.

**Citibank is forced to write-down Over $8 Billion in Bad Debt**

  67. The true facts, which were known by the Officer and Director Defendants but concealed from the investing public were as follows:

   (a) The Company was more exposed to CDOs containing subprime debt than it disclosed; and

   (b) The Company's Class Period statements were materially false due to their failure to inform the market of the extent of likely write downs in the Company's CDO portfolio due to the deteriorating subprime mortgage market which caused Citigroup's portfolio to be impaired.

  68. On October 1, 2007, Citibank issued a press release announcing that it was expecting a substantial decline in its 3Q 2006 net income due to "write downs in leveraged loan commitments," among other things, approximating $1.4 billion.

  69. This press release failed to disclose the full magnitude of Citigroup's exposure to the subprime market crisis.  In addition, one commentator stated, "Prince's position was especially shaky after the Company 3Q 2006 results were revised estimating the 3Q profit would decline about 60% to some $2.2 billion after

seeing nearly $6 billion in credit costs and write-downs of overly leveraged corporate

debt and souring home mortgages.  However, at that time, Prince continued to assure

investors that the Citigroup's earnings would return to normal in the fourth quarter."

> Citigroup Inc. announced today that dislocations in the mortgage-backed securities and credit markets, and deterioration in the consumer credit environment are expected to have an adverse impact on third quarter financial results.
>
> Citi currently estimates that it will report *a decline in net income in the range of 60% from the prior-year quarter,* subject to finalizing third quarter results.
>
> "Our expected third quarter results are a clear disappointment. The decline in income **was** driven primarily by *weak performance in fixed income credit market activities,* write-downs in leveraged loan commitments, and increases in consumer credit costs," said Charles Prince, Chairman and CEO of Citi.
>
> "Our fixed income trading business has a long history of earnings power and success, as shown in this year's record first half results. In September, this business performed at more normalized levels and we see this quarter's overall poor trading performance as an aberration. While we cannot predict market conditions or other unforeseeable events that may affect our businesses, we expect to return to a normal earnings environment in the fourth quarter," said Prince.
>
> The following accounts for a significant portion of the expected decline in third quarter results:
>
> **Securities and Banking**
>
> - Revenue reductions from: 8 *Write-downs of approximately $1.4 billion* pre-tax, net of underwriting fees, on funded and unfunded highly leveraged finance commitments. These commitments totaled $69 billion at the end of the second quarter, and $57 billion at the end of the third quarter. Write-downs were recorded on all highly leveraged finance commitments where there was value impairment, regardless of the expected funding date.
>
> - *Losses of approximately $1.3 billion* pre-tax, net of hedges, on the *value of sub-prime mortgage-backed securities*

*warehoused for future collateralized debt obligation* ("CDO") securitizations, CDO positions, and leveraged loans warehoused for future collateralized loan obligation ("CLO") securitizations.

- Losses of approximately $600 million pre-tax in fixed income credit trading due to significant market volatility and the disruption of historical pricing relationships. These revenue reductions were partially offset by lower expenses in Securities and Banking.

**Global Consumer:**

- An increase in credit costs of approximately $2.6 billion pre-tax versus the prior-year quarter due to continued deterioration in the credit environment, organic portfolio growth, and acquisitions. Approximately one-fourth of the increase in credit costs was due to higher net credit losses and approximately three-fourths was due to higher charges to increase loan loss reserves.

"Despite unusually poor results in certain businesses this quarter, Citi continues to execute its growth strategy and generate momentum across many of its franchises. Citi's international franchise continues to expand rapidly. Globally, revenues in equity underwriting, advisory, and transaction services are growing at a healthy double-digit pace, and customer volumes in the consumer business continue to show good growth. In Wealth Management, Citi's ability to serve client needs through the market dislocations is generating solid results. The structural expense initiatives announced in early April 2007 are on track and delivering the cost savings projected," said Prince.

Citi's estimated third quarter results include approximately $470 million of after-tax gain on the sale of Redecard shares.

70.    On October 15, 2007, the Individual Defendants caused or allowed Citigroup to issue a press release announcing the forecasted disappointing financial results for 3Q 2007. The press release stated net income of $2.38 billion, a decline of 57% from the Company's prior year results. The press release stated in relevant part:

Citigroup Inc. today reported net income for the 2007 third quarter of $2.38 billion, or $0.47 per share, a decline of 57% from the prior-year quarter. Results include a $7.4 million pre-tax gain on the sale of

Redecard shares. Return on equity was 9%. On October 1, 2007, Citi announced that it expected third quarter 2007 net income to decline in the range of 60%, subject to finalizing third quarter results.

**Management Comment.**

"This was a disappointing quarter, even in the context of the dislocations in the sub-prime mortgage and credit markets. A significant amount of our income decline was in our fixed income business, where we have a long track record of strong earnings, and this quarter's performance was well below our expectations. Although we generated strong momentum in many of our franchises, our fixed income results, along with higher credit costs in global consumer, led to significantly lower net income," said Charles Prince, Chairman and CEO.

"Importantly, many of our businesses performed well this quarter. Our international franchise continued to expand rapidly, with revenues up 29%. Our global wealth management franchise generated record revenues and transaction services posted another record quarter on double-digit earnings growth. In securities and banking, equity markets and underwriting revenues were up a combined 33%, and our advisory revenues grew 29%. Volumes in our consumer franchise continued to grow strongly with deposits up 18%, managed loans up 13%, and we opened 96 new branches around the world," said Prince. "As we move into the fourth quarter, we are focusing closely on improving those areas where we performed below expectation, while at the same time continuing to execute on our strategic priorities," said Prince.

**Third Quarter Summary:**

- Revenues were up 6%, led by 30% growth in international revenues.

  o **Global Consumer Revenues**. Global Consumer Revenues increased 14%, driven by international consumer up 35%, which included a $729 million pre-tax gain on the sale of Redecard shares. Excluding the gain, international consumer revenues increased 2 1 %, reflecting deposit and loan growth of 18% and 29%, respectively, **and** higher investment sales, up *26%*. U.S. consumer revenues were flat with the prior-year period as deposit and managed loan growth of 16% and 8%,

respectively, was offset by lower securitization results in cards and the absence of gains on sale of securities in the prior-year period in consumer lending.

o **Markets & Banking**.  Markets & banking revenues declined 24%, reflecting record transaction services revenues, up 38%, offset by a 44% decline in securities and banking. Securities and banking revenues declined due to write-downs and losses related to dislocations in the mortgage-backed securities and credit markets, including:

- *Write-downs of $1.35 billion pre-tax,* net of underwriting fees, on funded and unfunded highly leveraged finance commitments.

- *Losses of $1.56 billion pre-tax, net of hedges, on the value of sub-prime mortgage-backed securities warehoused for future collateralized debt obligation* ("CDO") securitizations, CDO positions, and leveraged loans warehoused for future collateralized loan obligation ("CLO") securitizations.

- Losses of $636 million pre-tax in fixed income credit trading due to significant market volatility and the disruption of historical pricing relationships.

- U.S. markets & banking revenues declined 87% and international revenues grew 7%. International revenues included strong double- digit revenue growth in Asia, Latin America, and Mexico.

  o Global Wealth Management revenues increased 41%, as U.S. revenues grew 14% and international revenues more than doubled, due to double-digit organic growth and increased ownership in Nikko Cordial.

  o Alternative investments revenues declined 63% as strong growth in client revenues was offset

by lower revenues from proprietary investment activities. Excluding acquisitions and the gain on sale of Redecard shares, total organic revenues declined 3%. The net interest margin declined 3 basis points versus the second quarter 2007.

- Operating expenses increased 22%, driven by increased business volumes and acquisitions, which were partially offset by savings firm structural expense initiatives announced in April 2007.

  o The company opened 96 new retail bank or consumer finance branches during the quarter, including 47 internationally and 49 in the U.S. Over the last twelve months, 820 retail **bank** and consumer finance branches have been opened or acquired. Excluding the impact of acquisitions, organic expense growth was 14%.

**Credit Costs**. Credit costs increased $2.98 billion, primarily driven by an increase in net credit losses of $780 million and a net charge of $2.24 billion to increase loan loss reserves.

- In U.S. consumer, higher credit costs reflected an increase in net credit losses of $278 million and a net charge of $1.30 billion to increase loan loss reserves. The $1.30 billion net charge compares to a net reserve release of $197 million in the prior-year period. The increase in credit costs primarily reflected a weakening of leading credit indicators, including increased delinquencies on mortgages and unsecured personal loans, as well as trends in the U.S. macro-economic environment, portfolio growth, and a change in estimate of loan losses inherent in the portfolio but not yet visible in delinquencies ("a change in estimate of loan losses").

- In International Consumer, higher credit costs reflected an increase in net credit losses of $460 million and a net charge of $717 million to increase loan loss reserves. The $717 million net charge compares to a net charge of $101 million in the prior-year period. The increase in credit costs primarily

reflected the impact of recent acquisitions, portfolio
growth, and a change in estimate of loan losses.

- Markets and banking credit costs increased $98
  million, primarily reflecting higher net credit losses
  and a $123 million net charge to increase loan loss
  reserves for specific counterparties. Credit costs
  reflected a slight weakening in portfolio credit
  quality.

- The effective tax rate on continuing operations was
  21.1% versus 27.4% in the prior-year period. The
  decline in the tax rate primarily reflected a higher
  proportion of earnings in foreign jurisdictions that
  have lower tax rates.

**Securities and Banking.**

Fixed income markets revenues declined $1.64 billion to $67
1 million, driven primarily by: Losses of $1.56 billion, net of
hedges, on sub-prime mortgages warehoused for future CDO
securitizations, CDO positions, and leveraged loans
warehoused for future CLO securitizations.

71.     Then, on November 4, 2007, Citibank announced that it was writing down its

subprime secured assets by $8 billion to $11 billion. In addition to a $1.4 billion write down

announced on October 1, 2007. The press release stated in relevant part as follows:

Citigroup Inc. announced today significant declines since September
30, 2007 in the fair value of the approximately $55 billion in U.S.
sub-prime related direct exposures in its Securities and Banking
(S&B) business. Citi estimates that, at the present time, the reduction
in revenues attributable to these declines ranges from approximately
$8 billion to $11 billion (representing a decline of approximately $5
billion to $7 billion in net income on an after-tax basis). These
declines in the fair value of Citi's sub-prime related direct exposures
followed a series of rating agency downgrades of sub-prime U.S.
mortgage related assets and other market developments, which
occurred after the end of the third quarter.

The impact on Citi's financial results for the fourth quarter firm
changes in the fair value of these exposures will depend on future
market developments and could differ materially firm the range
above. Citi also announced that, while significant uncertainty

continues to prevail in financial markets, it expects, taking into account maintaining its current dividend level that its capital ratios will return within the range of targeted levels by the end of the second quarter of 2008. Accordingly, Citi has no plans to reduce its current dividend level.

The $55 billion in U.S. sub-prime direct exposure in S&B as of September 30,2007 consisted of (a) approximately $1 1.7 billion of sub-prime related exposures in its lending and structuring business, and (b) approximately $43 billion of exposures in the most senior tranches (super senior tranches) of collateralized debt obligations which are collateralized by asset-backed securities (ABS CDOs).

**Lending and Structuring Exposures.**

Citi's approximately $1 1.7 billion of sub-prime related exposures in the lending and structuring business as of September 30, 2007 compares to approximately $13 billion of sub-prime related exposures in the lending and structuring business at the end of the second quarter and approximately $24 billion at the beginning of the year. The $1 1.7 billion of sub-prime related exposures includes approximately $2.7 billion of CDO warehouse inventory and unsold tranches of ABS CDOs, approximately $4.2 billion of actively managed sub-prime loans purchased for resale or securitization at a discount to par primarily in the last six months, and approximately $4.8 billion of financing transactions with customers secured by sub-prime collateral. These amounts represent fair value determined based on observable transactions and other market data. Following the downgrades and market developments referred to above, the fair value of the CDO warehouse inventory and unsold tranches of ABS CDOs has declined significantly, while the declines in the fair value of the other sub-prime related exposures in the lending and structuring business have not been significant.

**ABS CDO Super Senior Exposures.**

Citi's $43 billion in ABS CDO super senior exposures as of September 30, 2007 is backed primarily by sub-prime RMBS collateral. These exposures include approximately $25 billion in commercial paper principally secured by super senior tranches of high grade ABS CDOs and approximately $18 billion of super senior tranches of ABS CDOs, consisting of approximately $10 billion of high grade ABS CDOs, approximately $8 billion of mezzanine ABS CDOs and approximately $0.2 billion of ABS CDO-squared transactions.

Although the principal collateral underlying these super senior tranches is U.S. sub-prime RMBS, as noted above, these exposures represent the most senior tranches of the capital structure of the ABS CDOs. These super senior tranches are not subject to valuation based on observable market transactions. Accordingly, fair value of these super senior exposures is based on estimates about, among other things, future housing prices to predict estimated cash flows, which are then discounted to a present value. The rating agency downgrades and market developments referred to above have led to changes in the appropriate discount rates applicable to these super senior tranches, which have resulted in significant declines in the estimates of the fair value of S&B super senior exposures.

**Other Information.**

The fair value of S&B sub-prime related exposures depends on market conditions and assumptions that are subject to change over time. In addition, if sales of super senior tranches of ABS CDOs occur in the future, these sales might represent observable market transactions that could then be used to determine fair value of the S&B super senior exposures described above. As a result, the fair value of these exposures at the end of the fourth quarter will depend on future market developments.

Citi has provided specific targets for its two primary capital ratios: the Tier 1 capital ratio and the ratio of tangible common equity to risk-weighted managed assets (TCERWMA ratio). Those targets are 7.5% for Tier 1 and 6.5% for TCERWMA. At September 30, 2007, Citi had a Tier 1 ratio of 7.3% and a TCERWMA ratio of 5.9%.

72.    Additionally, on November 4, 2007, Citigroup filed its Form 10-Q for the third quarter 2007 ("Form 10 Q 2007") which revealed that Citigroup was revising its financial results from October 15, 2007. Ultimately, *Citigroup revised its net income downward by $166 million.* As a result of these disclosures, shares closed that day at $37.73, about 20% below where they were when Prince became CEO.

73.    As Prince could no longer conceal the disastrous conditions he had created for Citigroup, Prince tendered his resignation immediately.

74. Throughout the Relevant Period, Citigroup's statements misrepresented and failed to disclose material adverse facts. Moreover, Individual Defendants knew and consciously and recklessly disregarded these facts.

75. During the Relevant Period, Citigroup purchased billions of subprime mortgage loans from lenders and was misrepresented and failed to disclose the extent to which it was exposed to the subprime mortgage crisis. Accordingly, throughout the Relevant Period, Citigroup continued to report inaccurate earnings.

**INSIDER SELLING**

76. As a result of the false and inaccurate statements Citigroup and Individual Defendants caused to be issued, Citigroup's stock was artificially inflated at which time Individual Defendants authorized a buyback of its shares in excess of $653 million. At the time, the average price of Citigroup's shares were $53 per share, currently, Citigroup's share price is less than $36 per share. Accordingly, when Citigroup conducted the buyback and its shares were valued at $53 per share, certain Individual Defendants began to sell their holdings in the Company.

During the Relevant time period, the Insider Selling Defendants sold their Citigroup holdings at a time when they knew their statements regarding the Company were false and inaccurate. Therefore, while in possession of material non-public information Insider Selling Defendants made the following sales:

| | | **Insider Trading** | | |
|---|---|---|---|---|
| Inside Seller | Sales Date | Number of Shares | Sale Price | Proceeds |
| Bischoff | 1/22/07 | 17,708 | $54.55 | $965,971.40 |
| | 2/23/07 | 15,419 | $53.64 | $827,075.16 |
| | 8/11/06 | 35,000 | $47.75 | $1,671,250.00 |
| | | **33,127** | **$104.58** | **$3,464,296.56** |
| Bushnell | 1/22/07 | 25,528 | $54.55 | $1,392,552.40 |
| | 2/27/07 | 6,940 | $52.10 | $361,574.00 |
| | 2/27/07 | 6,584 | $52.68 | $346,845.12 |
| | 7/23/07 | 11,809 | $50.73 | $599,070.57 |
| | 8/15/06 | 1,100 | $48.39 | $53,229.00 |
| | | **51,961** | **$52.99** | **$2,753,271.09** |
| Druskin | 1/22/07 | 43,639 | $54.55 | $2,380,507.45 |
| | 1/29/07 | 20,000 | $54.02 | $1,080,400.00 |
| | 4/18/07 | 10,000 | $53.07 | $530,700.00 |
| | 7/13/07 | 23,885 | $52.84 | $1,262,083.40 |
| | 10/25/06 | 15,000 | $50.55 | $758,250.00 |
| | 4/24/06 | 5,744 | $47.87 | $274,965.28 |
| | | **118,268** | **$53.16** | **$6,286,906.13** |
| Freiberg | 1/22/07 | 21,162 | $54.55 | $1,154,387.10 |
| | 7/20/07 | 11,591 | $51.13 | $592,647.83 |
| | | **32,753** | **$53.34** | **$1,747,034.93** |
| Gerspach | 1/22/07 | 4,574 | $54.55 | $249,511.70 |
| | 4/17/07 | 19,128 | $52.93 | $1,012,445.04 |
| | | **23,702** | **$53.24** | **$1,261,956.74** |
| Helfer | 1/22/07 | **19,590** | **$54.55** | **$1,068,634.50** |
| Kaden | 1/22/07 | **11,200** | **$54.55** | **$610,960.00** |
| Klein | 7/17/07 | **19,282** | **$52.19** | **$1,006,327.58** |
| Krawcheck | 1/22/07 | **50,339** | **$54.55** | **$2,745,992.45** |
| Maheras | 7/13/07 | **23,964** | **$52.84** | **$1,266,257.76** |
| Prince | 1/22/07 | 81,087 | $54.55 | $4,423,295.85 |
| | 4/17/07 | 13,419 | $52.93 | $710,267.67 |
| | 5/17/07 | 13,395 | $54.91 | $735,519.45 |
| | 7/13/07 | 38,342 | $52.84 | $2,025,991.28 |
| | | **146,243** | **$53.99** | **$7,895,074.25** |
| Rhodes | 1/22/07 | 24,686 | $54.55 | $1,346,621.30 |
| | 2/5/07 | 8,000 | $55.03 | $440,240.00 |
| | 7/13/07 | 47,928 | $52.84 | $2,532,515.52 |
| | 11/22/06 | 4,319 | $50.74 | $219,146.06 |

| | | | | |
|---|---|---|---|---|
| | 5/3/06 | 12,500 | $49.70 | $621,250.00 |
| | 5/2/06 | 12,500 | $49.54 | $619,250.00 |
| | | **109,933** | **$52.57** | **$5,779,022.88** |
| Rubin | 1/22/07 | **77,500** | **$55.05** | **$4,266,375.00** |
| Volk | 1/22/07 | **16,347** | **$54.55** | **$891,728.85** |

## DEMAND FUTILITY

77.     Plaintiff brings this action derivatively in the right and for the benefit of Citigroup to redress damage suffered and to be suffered by Citigroup as a direct result of Defendants' breaches of fiduciary duty, corporate mismanagement, abuse of control and violations of the Exchange Act. This is not a collusive action to confer jurisdiction in this Court which it would not otherwise have. Plaintiff will adequately and fairly represent the interests of Citigroup and its shareholders in enforcing and prosecuting their rights.

78.     Plaintiff has not made any demand on the present board of Directors of Citigroup to institute this action because such demand would be a futile and useless act for the foregoing and following reasons:

**A Majority of the Board Faces a Substantial Threat of Liability**

79.     Citigroup's current board is made of up 13 directors. A majority of the directors, if not all, face a sufficiently substantial threat of personal liability to compromise their ability to act impartially on a demand. The members of Citigroup's Board of Directors are Parsons, Rubin, Derr, Thomas, Armstrong, Belda, Deutch, Ramirez, David, Mulcahy, Rodin, Ryan and Liveris.

80.     During the Relevant Period, Individual Defendants Parsons, Rubin, Derr, Thomas, Armstrong, Belda, Deutch, Ramirez, David, Mulcahy, Rodin, Ryan and Liveris, authorized the buyback of over $663 million worth of the Company's shares at artificially inflated prices. The Board did not exercise valid business judgment when it rendered the

- 40 -

decision to buyback the Company's shares. Moreover, the Board failed to properly discuss or consider the negative effects that the subprime mortgage crisis would have on the Company's business and business prospects. In addition, Individual Defendant Rubin engaged in self-dealing when he sold his personally held shares while directing the Company to purchase shares. Accordingly, demand is futile.

81.    During the Relevant Period, Individual Defendants Rodin, Ryan, Mulcahy, Liveris, Deutch, David, and Armstrong were member of Citigroup's audit committee. The audit committee's role is one of oversight. It is responsible for ensuring the integrity of Citigroup financial statements. The audit committee completely failed to fulfill its oversight role by allowing Citigroup to file financial statements with the SEC that, as discussed above, did not accurately describe the risks the Company faced as a result of its over exposure to CDOs and subprime loans. As such, each of these defendants cannot independently analyze or investigate the claims asserted in this action because each face a real and substantial danger of personal liability in this action.

82.    Notwithstanding Defendants knowledge of the claims and causes of action raised by Plaintiff, Citigroup's Board of Directors has failed and refused to seek recovery for Citigroup for any of the wrongdoing alleged by Plaintiff herein. Plaintiff has not made a demand on shareholders of Citigroup for any of the wrongdoing alleged herein by Plaintiff. Plaintiff has not made any demand on shareholders of Citigroup to institute this action since such demand would be a futile act because (1) Citigroup thousands of shareholders and is a publicly held company with over $4.9 billion shares outstanding; (2) A demand on such a large number of shareholders would be impossible for Plaintiff to make as Plaintiff cannot know all of the contact information for all shareholders; and (3) Assuming all shareholders

could be located and identified, a demand on all of them would force Plaintiff to incur massive expenses.

83.    Moreover, Individual Defendant Rubin, pursuant to his employment with Citigroup, received and continues to receive substantial monetary compensation and other benefits. Specifically, Citigroup paid Rubin the following compensation:

| Fiscal Year | Salary | Stock Awards | Option Awards | Bonus | Securities Underlying Options | Changes in Pension Value and Nonqualified Deferred Compensation Earnings | Other Compensation |
|---|---|---|---|---|---|---|---|
| 2006 | $1,000.000 | $6,766,666 | $828,342 | $8,400,000 | | $20,916 | $325,380 |
| 2005 | $1,000,000 | $6,766,677 | | $8,400,000 | $161,389 | | $330,392 |
| 2004 | $1,000,000 | $6,766,667 | | $8,400,000 | | | $461,439 |
| 2003 | $1,000,000 | $5,000,000 | | $10,250,000 | $100,000 | | $306,813 |

84.    Individual Defendants Belda, Derr, and Parsons are on Citigroup's Personnel and Compensation Committee. Accordingly, by virtue of their positions as members, Belda, Derr and Parsons, are not disinterested and/or independent from Individual Defendant Rubin and exert influence over Rubin's compensation. The Personnel and Compensation Committee has the authority to review and approve Rubin's base salary, bonus and equity compensation. As such, this lack of independence renders Rubin incapable of impartially considering a demand to commence and vigorously prosecute this action.

85.    The acts complained of constitute violations of the Exchange Act and violations of fiduciary duties owed by Citigroup's officers and directors and these acts are incapable of ratification.

86.    The Director Defendants are not disinterested parties as they participated in and approved or allowed the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from Citigroup's stockholders or recklessly and/or negligently disregarded the wrongs complained of herein.

87.    Each key officer and director knew of and/or directly benefited from the wrongdoing complained of herein.

88.    Each Director Defendant authorized and/or allowed the false statements disseminated directly to the public and securities analysts. These false statements were made available to and distributed to shareholders by Defendants who authorized and/or permitted the issuance of various improper statements and principal beneficiaries of the wrongdoing alleged herein, and thus could not fairly and fully prosecute this suit whether or not the suit was instituted by them.

89.    On information and belief, each of the Director Defendants approved an authorized Prince's severance package, which is valued at more than $100 million. In doing so, each of the Director Defendants wasted the Company's assets in that the severance package was exorbitant given the circumstances and given without consideration since the Company could have, and should have, terminated Prince's employment for cause. As such, each Director Defendant faces a substantial threat of personal liability for this reason as well.

## COUNT I

### (Breach of Fiduciary Duties of Care, Loyalty and Good Faith)

90.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

91.    As alleged in detail herein, Prince, and each of the Individual Defendants, had a duty to Citigroup and its shareholders to, amongst other things, ensure that the Company operated in a diligent, honest and prudent manner.

92.    Plaintiff asserts this claim derivatively on behalf of Citigroup against Prince and all of the Director Defendants.

93.    Prince and the Individual Defendants have breached their fiduciary duties of care, loyalty and good faith owed to Citigroup and its stockholders.

94.    Further, each of the Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the financial results of the Company and failed to correct the Company's publicly reported financial results and guidance.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

95.    By reason of the foregoing, Citigroup has sustained and will continue to sustain serious damage and irreparable injury, for which relief is sought herein.

96.    Plaintiff and Citigroup have no adequate remedy of law.

## COUNT II

### (Against Insider Selling Defendants for Insider Selling and Breach of Fiduciary Duties)

97.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

99.    During the time that Insider Selling Defendants made their sold their stock holdings in the Company, Insider Selling Defendants were in possession of non-public material adverse information concerning the Company's financial condition and sold their common stock on the basis of such information.

100.    At the time of their stock sales, the Insider Selling Defendants knew the Company's revenues were materially overstated. The Insider Selling Defendants' sold their Citigroup stock while in possession of non-public material adverse information and accordingly have breached their fiduciary duties of loyalty and good faith.

101.    Accordingly, as the Insider Selling Defendants used the non-public material adverse information for personal gain, they have breached their fiduciary duties and the Company is entitled to the imposition of a constructive trust for any profits they wrongfully obtained.

## COUNT III

**(Derivatively Against All Defendants for Violation of the Exchange Act §§ 10(b) and 10b-5)**

102.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

103.    During the Relevant Period, Individual Defendants made false and inaccurate statements concerning Citigroup's financial condition and business prospects to its shareholders and the public. Individual Defendants knew, consciously disregarded and were reckless and grossly negligent in causing the false and misleading statements to be made.

104.    In addition, during the Relevant Period, the Insider Selling Defendants made millions by selling their Citigroup holdings while in possession of non-public material adverse information at inflated prices.

105.     As a result of the Company's undisclosed exposure to the subprime mortgage crisis, the Company's stock was inflated and Insider Selling Defendants were selling their common stock, Individual Defendants were causing Citigroup to buyback in excess of $663 million of its own stock on the open market at and inflated price of $53 per share, which is substantially higher than the Company's current share price of less than $36 per share. Accordingly, Individual Defendants violated the Exchange Act §10(b) and Rule 10b-5.

106.     As a result of Individual Defendants' misconduct, Citigroup paid artificially inflated prices for Citigroup stock and has suffered damages accordingly.  Had the market been aware that the share price of Citigroup's common stock was artificially inflated by defendants' misleading statements, Citigroup would not have purchased common stock at that price.

107.     Therefore, during the Relevant Period, Individual Defendants directly and proximately caused Citigroup's damages in connection with Citigroup's purchases of its common stock.

## COUNT IV

### (Corporate Waste)

108.     Plaintiff repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

109.     Plaintiff alleges this cause of action on behalf of Citigroup against Prince and the Individual Defendants.

110.     Each Individual Defendant owes and owed to Citigroup the obligation to protect Citigroup's assets from loss or waste.

111. Individual Defendants' failure to adequately evaluate and monitor Citigroup's risk in the CDO market constituted a waste of Citigroup's corporate assets and was grossly unfair to Citigroup. In addition, by failing to properly supervise and paying $663 million to buyback the Company's stock, and by paying bonuses to certain of its officers, no person of ordinary, sound business judgment could conclude that Prince's and the Individual Defendants' decision to become so overextended in the risky CDO market was a sound exercise of business judgment.

112. Further, the Individual Defendants committed corporate waste by authorizing and approving Prince's exorbitant severance package. There was no consideration for Prince's $100 million severance given that Prince was subject to termination for cause.

113. By reason of the foregoing, Citigroup has sustained and will continue to sustain serious damage and irreparable injury, for which relief is sought herein.

114. Plaintiff and Citigroup have no adequate remedy at law for the wasteful and wrongful conduct engaged in by the Individual Defendants.

115. Plaintiff and Citigroup are therefore entitled to judgment against the Individual Defendants as specified below.

## COUNT V

### (Against All Defendants for Abuse of Control)

116. Plaintiff repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

117. Defendant Prince and the Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Citigroup, for which they are legally responsible.

118.    As a direct and proximate result of these defendants' abuse of control, Citigroup has sustained significant damages.

119.    As a result of the misconduct alleged herein, these Defendants are liable to the Company.

## COUNT VI

### (Against All Defendants for Gross Mismanagement)

120.    Plaintiff repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

121.    By their allegations alleged herein, Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Citigroup in a manner consistent with the operations of a publicly held corporation.

122.    As a direct and proximate result of these defendants' gross mismanagement and breaches of duty alleged herein, Citigroup has sustained significant damages in excess of $8 billion dollars.

123.    As a result of the misconduct and breaches of duty alleged herein, these defendants are liable to the Company.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment in its favor and in favor of Citigroup against all of the Defendants as follows:

A.    Against all the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, and waste of corporate assets;

B.      Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures to protect Citigroup and its shareholders from a repeat of the damaging events described in this Complaint, including but not limited to, adopting the following remedial measures:

a.      strengthening the board's supervision and oversight responsibilities and developing a system to ensure the board accurately manages the Company's risk potential;

b.      prohibiting and individual from concurrently serving as the Chief Executive Officer and the Chairman of the Board;

c.      allowing the Company's shareholders to nominate at least one candidate for election to the board; and

d.      a policy of ensuring the accuracy of the qualifications of Citigroup's directors, executives and other employees;

C.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts fees, costs and expenses; and

D.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated:  November 14, 2007                    respectfully submitted,

**BROWER PIVEN**
   A Professional Corporation

By: _____
David A.P. Brower (DB-4923)
Elizabeth A. Schmid (ES-1294)
488 Madison Avenue
Eighth Floor
New York, New York 10022
Telephone: (212) 501-9000
Facsimile: (212) 501-0300

*Counsel for Plaintiff Sam Cohen*

# VERIFICATION

I, Samuel T. Cohen, verify:

I am the Plaintiff in the above-entitled action; I hereby verify that I was a shareholder of Citigroup, Inc. at the times the misconduct complained of in the Verified Derivative Complaint for Breach of Fiduciary Duties ("Complaint") occurred. Additionally, I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and believe them to be true. Having received a copy of this Complaint, having reviewed it with my counsel, I hereby authorize its filing.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 13th day of November 2007 at Baltimore, Maryland.

Samuel T. Cohen